Kenneth BITGOOD, d.b.a.

v.

**ALLSTATE INSURANCE COMPANY**
et al.

No. 81–504–Appeal.

Supreme Court of Rhode Island.

Aug. 21, 1984.

Leo P. Attilli, Providence, for plaintiff.

Paul A. Anderson, Anderson, Henning & Anderson, Providence, Dennis J. Roberts II, Atty. Gen., Richard B. Woolley, Sp. Asst. Atty. Gen., for defendants.

## OPINION

WEISBERGER, Justice.

This is a civil action in which the plaintiff, Kenneth W. Bitgood (Bitgood), the insured under a fire-insurance policy issued by defendant Allstate Insurance Company (Allstate), seeks to recover both from the state and the State Deputy Fire Marshal, Everett Ignagni (Ignagni), for damages allegedly resulting from misconduct on the part of Ignagni in connection with the investigation of a fire occurring at Bitgood's business premises and from Allstate for prejudgment interest.

The series of events giving rise to the instant action originate in Bitgood's purchase of a $25,000 fire-insurance policy on his business, Ridgerunner Speed Shop, a store for high-performance auto parts located at 608 Broad Street in Cumberland, Rhode Island, from Allstate in September 1975. During the early morning hours of December 6, 1975, the building and inventory were destroyed by an explosion and a fire. Bitgood testified that earlier that night, he had arranged to have Michael Gallipeau, his car-racing associate, purchase three five-gallon containers of gasoline from a local gas station and deliver them to his establishment for the purpose of fueling a ramp truck so that Bitgood could drive the truck home. Bitgood was not in the habit of driving the ramp truck home as it was usually used solely to transport the racing car stored in Bitgood's business shop to and from competitive events. After the delivery of the gasoline, Bitgood closed the shop for the day and went home, only to return to his business premises a short time later when he became aware of an explosion and a fire in the vicinity of his store. The deputy fire marshal, Ignagni, was at the scene, and a brief conversation between the two parties ensued concerning the building's contents and other formalities. At some point thereafter, Bitgood returned home.

Later that morning the police contacted Bitgood to arrange for another discussion with Ignagni to be conducted at the scene of the fire. That same day, in the aftermath of the fire and the cleanup, the charred body of Michael Gallipeau was discovered in the debris. Prior to the discovery of the body, no one had been aware that Gallipeau might have been in the building. This factor accompanied by sev-

eral other suspicious circumstances resulted in the commencement of an extensive investigation into the fire by the State Fire Marshal's office in conjunction with the Cumberland police department. Bitgood was questioned a third time at Cumberland police headquarters on the following afternoon. Ignagni requested that Bitgood consent to taking a polygraph test as part of the standard fire investigation. Bitgood refused this request. After seeking the advice of his attorney, Bitgood again declined to give his consent (as the trial justice ruled he had a right to do).

Pursuant to the insurance-policy provisions, Bitgood submitted an inventory to Allstate in the early spring of 1976 which failed to conform to the required proof of loss. Subsequently, in May 1976, a satisfactory inventory was submitted to Allstate. However, Allstate representatives believed that there was a possibility that the investigation might reveal evidence that Bitgood was criminally involved with the fire. Therefore, Allstate, while awaiting the fire marshal's final report, advised Bitgood and his attorney that it would be willing to pay the face amount of the policy ($25,000) upon the receipt of the fire marshal's report absolving Bitgood of criminal responsibility for the fire. It was further stated at trial that Allstate's company policy was to postpone the settlement of claims of this nature until a final copy of the report was received from the State Fire Marshal.

As part of the continuing investigation by the fire marshal's office, certain gas-meter equipment found on the business premises was sent to be tested at the University of Rhode Island crime laboratory. The crime laboratory's report was not received by Ignagni until May 19, 1976.[1] When the information was received evidencing nothing suspicious regarding the gas-meter equipment, the fire marshal's report was submitted on June 10, 1976, to a special assistant attorney general who formed the opinion that there was insufficient evidence to warrant the issuance of an information or indictment against anyone in connection with the December 6, 1975 fire. Therefore, the case was put in a "closed status," which required no further review by law enforcement authorities. Ignagni prepared a final report embodying this information on June 29, 1976.

On July 15, 1976, Bitgood instituted suit against Ignagni, two deputy fire marshals, the state, Allstate, and two of its agents, alleging, among other counts of misconduct incident to the settlement of the fire-loss claim, a conspiracy to delay the issuance of the fire marshal's report. Subsequently, Bitgood sought to amend his complaint to include counts pursuant to 42 U.S.C.A. §§ 1983, 1985 for violation of his federally protected rights as a result of the tortious interference with his contractual and personal relationships. The motion to file the amended complaint was granted on November 6, 1980. On November 13, 1980, defendants filed a motion to dismiss the amended complaint, which was denied by the trial justice after memoranda of law were filed and oral argument heard on the matter.

The fire marshal's report was received by Allstate and by Bitgood in February 1977. No explanation was furnished for the delay in the delivery of this report from the date of its preparation. Thereafter, Allstate evaluated Bitgood's claim under its standard settlement procedure. Authorization for settlement of the claim was issued by the company, and numerous offers to tender the full policy coverage amount of $25,000 were made to Bitgood by Allstate. Finally, prior to trial Bitgood accepted the policy limit, and judgment for this amount was entered with the provision, by agreement of the parties, that the issue of the addition of prejudgment interest would be

---

1. From the point of view of the fire marshal, the determination that there was nothing wrong with the gas meter tended to cast more suspicion upon Bitgood. It was necessary to rule out the possibility of a defect in the gas meter before drawing conclusions from other circumstantial evidence relating to a possible deliberate setting of the fire.

submitted to the trial justice for determination. A dismissal with prejudice of Bitgood's actions against two of Allstate's adjusters and an agreed statement of facts were made part of the judgment order. The judgment and findings of fact read as follows:

"1. Judgment may enter in favor of the plaintiff in the sum of Twenty-five thousand ($25,000) dollars against the defendant, Allstate Insurance Company.

"2. The plaintiff's claims against the defendants, Domenic Rendine and Edward Candell, a/k/a Edward Kennelly, are dismissed with prejudice.

"3. The plaintiff, Kenneth Bitgood and the defendant, Allstate Insurance Company, agree to the following facts:

"a. There was an insurance policy issued to the plaintiff, Kenneth Bitgood, by the Allstate Insurance Company identified as Policy No. 19–596–990 BP. Said policy was issued on or about September 12, 1975, and said policy included a fire loss provision relating to the business fixtures and contents of a building located at 608 Broad Street in the Town of Cumberland identified as 'The Ridgerunner Speed Shop.'

"b. On or about December 6, 1975, the above mentioned building and its contents were destroyed by fire. At the time of said fire the policy of insurance referred to above was in full force and effect.

"c. Subsequent to said fire an inventory was submitted to the Allstate Insurance Company on or about May 1, 1976, in compliance with the appropriate provisions of said policy.

"d. The Allstate Insurance Company did not make payment on this loss, at that time, due to the fact that neither it nor the plaintiff were able to obtain a copy of the State Fire Marshal's report of the incident. Further, it was alleged that there were 'suspicious circumstances' surrounding the cause of the fire which allegedly brought about the delay in the release of the report.

"e. During the month of July the plaintiff, Kenneth Bitgood, instituted the instant action in the Providence County Superior Court.

"f. In February 1977 the State Fire Marshal's report was first made available to both the plaintiff and the defendant, Allstate Insurance Company.

"g. Within two to three weeks subsequent to the release of the report the defendant, Allstate Insurance Company, offered payment of the full face amount of the policy totalling Twenty-five thousand ($25,000.00) dollars. Said offer was contingent solely on the plaintiff dismissing his suit against the Allstate Insurance Company and its agents."

It should be noted that the agreed statement of facts includes no explanation for the delay encountered by Allstate or Bitgood in receiving the final report of the fire marshal. The evidence in the case also provides no reasons for this delay. Former counsel for Bitgood stated in his testimony that his first request in writing for the report was made on February 8, 1977. The report was forwarded to counsel on February 10, 1977. Although counsel testified that he had made many calls to the Attorney General's office subsequent to the bringing of suit, he could not recall to whom he spoke during these telephonic communications.

Bitgood's case against both Ignagni in his capacity as deputy fire marshal and the State of Rhode Island proceeded to trial. At the close of all the evidence, the trial justice granted Ignagni's motion for a directed verdict. This case is presently before us on appeal from the judgment entered pursuant thereto. In addition, Bitgood appeals from the trial justice's order denying him prejudgment interest in addition to the policy limit of $25,000 as against Allstate.

The state has filed a cross-appeal raising issues of improper service of process, amendment of the complaint, denial of its motion to dismiss, and denial of an award of attorney fees. These contentions will be

dealt with after we have considered the issues raised by Bitgood. Facts will be furnished as necessary in the discussion of such issues.

## I

Bitgood first contends that the trial justice erred in granting Ignagni's motion for a directed verdict at the close of all the evidence. The argument set forth in support of this contention is that reversible error was committed when the trial justice predicated his decision on governmental immunity despite the fact that the evidence showed bona fide issues of fact pertaining to violations of Bitgood's civil and property rights under color of state law pursuant to 42 U.S.C.A. § 1983 and § 1985. Bitgood alleges that his rights were infringed upon by the delay in filing of the fire marshal's report and the request that he submit to a lie-detector exam in light of defendant's full knowledge that the insurance claim would not be settled until Allstate was in receipt of the report, thereby causing Bitgood to suffer severe economic hardship.

■ The standard of review this court must apply when considering a trial justice's decision on a motion for a directed verdict is well established. It is the obligation of this court, as it was the duty of the trial court, to view the evidence in the light most favorable to the party against whom the motion has been made, giving that party the benefit of all reasonable and legitimate inferences that may properly be drawn, absent any consideration of the witness's credibility or the weight of the evidence. Where issues exist upon which reasonable minds might draw conflicting conclusions, or where there is any evidence supporting the nonmoving party, a question of fact arises that must be submitted to the jury. *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.*, R.I., 474 A.2d 436, 442 (1984); *Fiske v. MacGregor, Division of Brunswick*, R.I., 464 A.2d 719, 723 (1983); *Katz v. Prete*, R.I., 459 A.2d 81, 84 (1983); *Marcotte v. Harrison*, R.I., 443 A.2d 1225, 1229 (1982);

*DiIorio v. Abington Mutual Fire Insurance Co.*, 121 R.I. 689, 693, 402 A.2d 745, 747 (1979). Applying this test to the evidence adduced at trial in the case at bar, we conclude that the motion for a directed verdict was properly granted. In directing a verdict against Bitgood on the civil rights claim, the trial justice provided the following rationale.

"The evidence in the case would tend to establish that the delay in issuing the report prevented the plaintiff from recovering the benefits of his insurance policy. There is no question but that this had a severe economic impact on him and no question he went through a very difficult period. What the evidence might establish here, if anything, would be tortious interference with contractual rights, not a deprivation of property or anything like that * * *. There is no evidence that would warrant an action based on constitutional rights or civil rights action grounded on a constitutional deprivation under section 1983 or 1985 of title 42 of the U.S.C. as the Court sees it."

■ 42 U.S.C.A. §§ 1983 and 1985 do not create remedies for every wrong committed under color of state law. Only deprivation of rights secured by the Constitution and laws of the United States are actionable. *See, e.g., Ohio Inns, Inc. v. Nye*, 542 F.2d 673, 678–79 (6th Cir.1976); *Street v. Surdyka*, 492 F.2d 368, 370–71 (4th Cir.1974); *Simmons v. Wetherell*, 472 F.2d 509, 511 (2d Cir.1973). In the case at bar, at most the allegations of the complaint tended to show a tortious interference with the contractual rights between Bitgood and his insurer. The evidence in the case fell woefully short of showing any willful interference with the contractual rights of Bitgood which could rise to the level of a tortious act. In respect to a violation of any federally protected rights of Bitgood, there was not even a colorable claim in the face of the undisputed facts of the case.

The trial justice further premised his directed-verdict decision on the complete lack

of evidence to support any claim of bad faith on the part of Ignagni with regard to the fire investigation. Considering the statutory response of the fire marshal, the trial justice stated:

"There is evidence that the fire marshal pursued his duties vigorously; engaged in some unpleasantries with the attorney then representing plaintiff; possibly used some objectionable language, but, there is absolutely no evidence that the fire marshal did anything more than strictly enforce the law and strictly pursue the duties imposed on him by law."

The duties and powers of the State Fire Marshal and his deputies or assistants are set forth in G.L. 1956 (1979 Reenactment) chapter 28.2 of title 23. Section 23–28.2–11, entitled "Investigation of Fires," states:

"The state fire marshal and/or any of the deputy state fire marshals or assistant state fire marshals may investigate any fire and *shall investigate the cause, origin and circumstances of every fire of suspicious origin, by which property has been damaged or destroyed and any fire where a fatality occurs as the result of said fire and so far as it is possible determine the cause of said fire.* Such investigation shall begin immediately after the occurrence of such fire and local government officials shall cooperate completely and assist the state fire marshal's office in all phases of any such investigation.

"It shall be the responsibility of the local authority having jurisdiction to notify the state fire marshal's office of any fire of suspicious or incendiary origin or where death may have resulted from said fire. The fire marshal shall adopt notification procedures." (Emphasis added.)

The fire at Bitgood's business shop was deemed to be of suspicious origin, and thus an investigation into the origin of the explosion was warranted. As a primary concern, a fatality occurred that presumably was a result of the fire. The fire marshal's office is under a mandatory duty to investigate in order to determine the cause of a fire when a fatality occurs. The fact that the body of Michael Gallipeau was found unquestionably burned to death was sufficient to require an intensive investigation. Section 23–28.2–13 provides:

"If, upon such investigation, the fire marshal believes that the evidence is sufficient to charge any person with the commission of any offense, he shall report the same to the attorney general. The fire marshal shall make a report of the same in writing and such report shall be filed in the office of the state fire marshal within ten (10) days after the making thereof."

On June 10, 1976, pursuant to this dictate, Ignagni met with a special assistant attorney general to report the evidence collected to date. The Attorney General's assistant was of the opinion that there was insufficient evidence to warrant the issuance of an information or indictment against any person and the case was placed in a "closed status." Subsequently, Ignagni prepared a final report that was filed on June 29, 1976. The report is required to be filed within ten days after the making thereof, not after the consultation with the Attorney General's office. Absent evidence to the contrary, we assume this report was handled in accordance with this procedure. Ignagni owed no duty to Bitgood to file the report within a specific period, provided a proper investigation was being conducted. Rather, Ignagni, as deputy fire marshal, owed a duty to the public at large to investigate any fires of suspicious origin or those in which a fatality occurred, as in the case at bar.

Section 23–28.2–17 purports to relieve the fire marshal and his personnel from any personal legal liability resulting from the carrying out of their responsibilities.

"The state fire marshal, his deputies, and assistants, charged with the enforcement of the fire safety code, shall not render themselves liable personally, and they are hereby *relieved from all personal liability for any damage that may accrue to persons or property as a*

*result of any act required or permitted in the discharge of their official duties.* Any suit instituted against any officer or employee because of an act performed by him in the *lawful discharge of his duties,* and under the provisions of the fire safety code, shall be defended by the legal representative of the state until the final termination of the proceedings. In no case shall the fire marshal, his deputies, or assistants, be liable for costs in any action, suit, or proceedings that may be instituted in pursuance of the provisions of the fire safety code, and any *fire marshal, acting in good faith and without malice, shall be free from liability for acts performed under any of its provisions or by reason of any act or omission in the performance of his official duties in connection therewith."* (Emphasis added.) Section 23–28.2–17.

▋ Therefore, the question arises whether Ignagni, in his capacity as deputy fire marshal, acted in good faith and without malice in carrying out the fire investigation. The evidence presented showed that Ignagni questioned Bitgood on three separate occasions concerning the fire and his business. Ignagni learned that the insurance policy was taken out on the property in September 1975, three months prior to the fire. Also brought out was the fact that Bitgood was experiencing financial difficulties in his business. Ignagni learned that a considerable amount of gasoline had been purchased earlier the evening of the fire, of which approximately ten gallons remained stored at the auto shop. Bitgood testified that he had thrown the slightly burned and melted plastic containers containing the gasoline into the dumpster in back of his shop because he had just wanted to get them out. Those facts accompanied by other circumstantial evidence surrounding the fire, provided Ignagni with good reasons to investigate the cause of the fire with great care.

Ignagni carried out the investigation well within the confines of his authority. He filed two preliminary reports pertaining to the fire investigation on January 13, 1976, and February 3, 1976, and the final report on June 29, 1976. A review of the record shows insufficient evidence of bad faith or malice on the part of Ignagni to subject him to personal liability for his official actions under § 23–28.2–1. The record failed to disclose substantial evidence to support the allegation of bad faith as an issue for the jury. Under the facts of the case at bar, because of the suspicious nature of the fire, the delay caused by the necessary time allotted to proceed with an investigation was warranted. The fact that Bitgood brought suit on July 15, 1976, against the fire marshal probably contributed to some extent to the difficulties of communication between former counsel for Bitgood and Ignagni thereafter. Certain claims of privilege were raised by the Attorney General on behalf of the fire marshal and Ignagni in respect to the service of subpoenas incident to the taking of depositions. These legal impediments were ·finally removed when a formal letter requesting the fire marshal's report was sent on February 8, 1977, and complied with on February 10, 1977. The maneuvering by counsel in respect to the response to prior subpoenas could not be the basis for any determination of malice on the part of Ignagni. Therefore, we conclude that Ignagni's motion for a directed verdict was properly granted by the trial justice.

## II

▋ A second issue before us on appeal concerns the trial justice's denial of Bitgood's motion for prejudgment interest in excess of his $25,000 insurance policy's coverage limit on the judgment against Allstate. This issue was most recently addressed by this court in *Etheridge v. Atlantic Mutual Insurance Co.,* 480 A.2d 1341 (R.I.1984). In the instant case, we are not dealing with a cause of action in tort for a bad-faith refusal to pay a claim under an insurance policy. The evidence shows that Allstate offered to settle for the full policy coverage as soon as it received the fire

marshal's report in February 1977. It was company policy to postpone settlement pending completion of such an investigation to ensure that the insured was not criminally responsible for the fire. The approximately fifteen-month lapse of time between December 6, 1975 and the spring of 1977, when the claim was finally settled, is the delay being alleged as a bad-faith refusal to pay the insured's claim. In *Etheridge*, we reiterated our holding in *A.A.A. Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co.*, 121 R.I. 96, 98–100, 395 A.2d 724, 725–26 (1978), that there is no action in tort for an insurer's bad-faith refusal to pay the claim of its insured under a standard fire-insurance policy in the absence of legislative action. *Etheridge*, at 1348.

■ Although G.L. 1956 (1969 Reenactment) § 9–1–33 now provides for action against an insurer for bad-faith refusal to pay a claim, that statute is not applicable to the case at bar since it was not enacted until 1981. In any event, the trial justice decided that there was no evidence to show that Allstate acted in bad faith by delaying the payment of this claim until receipt of the fire marshal's report. An examination of the record before us discloses no evidence of bad faith or arbitrary delay in the payment of this claim. The fact of the seven-month delay in receipt of the fire marshal's final report by Allstate is not sufficient to support an inference of bad faith on its part, in light of the agreed statement that the report was not available to Allstate until February 1977. The burden of proof in this case rested upon Bitgood. It was not the responsibility of Allstate to prove that it acted in good faith. It was the responsibility of Bitgood to present evidence from which an inference of bad faith or proof of bad faith could be shown. This burden was not sustained. Consequently, the denial by the trial justice of prejudgment interest in excess of policy limits was not error.

### III

We have examined the issues raised by the state and Ignagni in their cross-appeal of alleged improper service of process, the granting of Bitgood's motion to amend his complaint, and the denial of the state's motion to dismiss and hold that these issues have been rendered moot in light of the fact that the state and its deputy fire marshal, Ignagni, are the prevailing parties in this action.

■ With respect to the state's contention that the trial justice committed reversible error in failing to award attorney's fees pursuant to 42 U.S.C.A. § 1988, we recognize that the question of an award of attorney's fees is within the parameters of judicial discretion and will not be disturbed absent a clear showing of an abuse of such discretion. *Young v. Exum*, 110 R.I. 685, 692, 296 A.2d 451, 455 (1972). Moreover, no evidence was presented by the state on the amount of attorney's fees incurred in defending the civil-rights action as separate from the tortious interference-with-contract action. No attorney's fee would be allowable to the prevailing party on the action based upon state law. Only those attorney's fees incurred pursuant to the Federal Civil Rights Act could be granted to the defendant in the discretion of the court. 42 U.S.C.A. § 1988; *see Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416, 98 S.Ct. 694, 697, 54 L.Ed.2d 648, 652 (1978). Counsel fees are not awarded to prevailing defendants routinely, but only in the sound discretion of the court when actions are brought frivolously. *Id.* at 421, 98 S.Ct. at 700, 54 L.Ed.2d at 657. Although it might be argued that in the present case the civil rights portion of the action was groundless, the failure to set forth clearly the attorney's fees applicable to that portion of the case was an adequate basis for the trial justice's refusal to exercise his discretion in favor of such an award.

For the reasons stated, the plaintiff Bitgood's appeal and the defendants' cross-appeal are denied and dismissed, and the judgment of the Superior Court is af-

firmed. The papers in the case may be remanded to the Superior Court.

MURRAY and SHEA, JJ., did not participate.